No. 47,503

In the Matter of the Atchison, Topeka and Santa Fe Railway Company, *Appellee*, v. Anthony D. Lopez, Harriet Graham and, the Kansas Commission on Civil Rights, *Appellants*.

(531 P. 2d 455)

Opinion filed January 25, 1975.

*Roger W. Lovett*, of Topeka, argued the cause, and *Vern Miller*, attorney general, and *Charles S. Scott*, of Topeka, were with him on the brief for the appellants.

*J. B. Reeves*, of Topeka, argued the cause, and *T. R. Conklin*, of Topeka, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: The Kansas Commisison on Civil Rights (hereinafter referred to as Commission), Anthony D. Lopez (executive director of the Commission), and Harriet Graham (investigator for the Commission) appeal to this court from an order of the District Court of Shawnee County, Kansas, permanently enjoining the appellants from enforcing or seeking to enforce a subpoena *duces tecum* served upon the Atchison, Topeka and Santa Fe Railway Corporation (hereinafter referred to as Santa Fe) in the course of an investigation of a complaint alleging discrimination, to the extent that the subpoena would require the production of "Arrest and Conviction Records" of all employees hired into the "Trackman" classification during the year 1972 in the eastern division of Santa Fe.

The parties agree the issues to be determined are:

(a) Is there a constitutionally protected right to privacy extending to the arrest and/or conviction records as reflected in the personnel files of Santa Fe's employees?

(b) If such right exists, would the divulging of such information pursuant to the Commission's subpoena be a defense to possible actions brought against Santa Fe by its employees for violation of their constitutional rights?

(c) Is there a compelling public necessity for disclosing the arrest and conviction records overriding the right of privacy, if such exists?

The facts are not in dispute. On April 4, 1972, Arnold S. Lopez, a 29 year old Mexican-American, filed an application for employment with the eastern division of Santa Fe as a trackman. A trackman is one of 25 or 30 different classifications of maintenance of way employees. Lopez was placed on the job at that time and his application was forwarded to the special services department for processing. Included in the application was a question relating to crimes for which the applicant had been convicted, and Lopez answered by writing: "parole 2 Mont Carroll Wray Misdemeanor". In his application Lopez consented to fingerprinting and authorized Santa Fe to check them with, or furnish them to, any federal, state or local government agency. Pursuant to company procedure, a check was made by the superintendent of special services on the applicant's past criminal record. The superintendent filed his report by letter dated April 10, 1972, showing twenty convictions for various offenses including assault and battery, drunk, driving while intoxicated, resisting arrest and numerous traffic offenses. Seven other entries are shown indicating possible arrests or inquiries concerning Lopez. The recommendation on the report was not to employ Lopez. On April 14, 1972 a certified letter was mailed to Lopez informing him that, "it is necessary your services be discontinued, account your application disapproved."

In May of 1972 Lopez filed a complaint with the Kansas Commission on Civil Rights charging Santa Fe and its representatives with violating the Kansas Act Against Discrimination "for terminating me because I am a Mexican American."

Lopez' complaint was served upon Santa Fe on May 24, 1973, and Harriet Graham, investigator or field representative of the Commission, initiated an investigation to ascertain whether there was any basis for the complaint. It soon became evident to the Commission that Lopez had been discharged due to the nature of his police record and the investigation was directed toward determining whether Lopez' record had been considered in the same

light as the records of other employees and applicants, as well as to determine whether the employer had considered factors which had a disparate impact on persons of Lopez' ancestry and for which there was no valid business purpose. Santa Fe cooperated in the investigation by furnishing lists of employees and other records to Ms. Graham.

However, Santa Fe refused to make arrest and conviction records of its employees available to the Commission; consequently, on September 27, 1973, Ms. Graham served a subpoena *duces tecum* signed by Lopez upon a Santa Fe attorney seeking:

"Complete and total personnel records, including, but not limited to the 'Arrest and Conviction Records', of all employees hired into the 'Trackman' classification during the calendar year 1972, in the Eastern Division, Atchison, Topeka and Santa Fe Railroad, Emporia, Kansas."

This action was filed October 3, 1973, by Santa Fe and requested the court to temporarily and permanently enjoin and to restrain the Commission from enforcing or seeking to enforce the above subpoena which would require the production of "Arrest and Conviction Records" as may be shown in the personnel files of any Santa Fe employees. The petition alleged that furnishing the arrest and conviction records sought by the subpoena *duces tecum* would constitute denial of the civil rights of the employees in the designated classes in violation of numerous statutes and constitutional provisions, both state and federal; compliance would subject Santa Fe to suit for damages for violation of its employees' civil rights; and by reason of its dilemma in choosing between damage suits by its employees and contempt action by the Commission, Santa Fe was subjected to irreparable damage. The petition also alleged a procedural defect in the subpoena.

Thereafter, the Commission issued an identical subpoena but cured the procedural defect contained in the original subpoena, and Santa Fe amended its petition to refer to the second subpoena. The parties agreed the issues were the same in both petitions and the court should determine the matter.

A temporary injunction was issued and thereafter consideration of a permanent injunction was before the trial court on December 7, 1973, for a hearing on Santa Fe's motion for judgment on the pleadings. Affidavits were presented to and accepted by the trial court and due notice having been given, with all parties having a reasonable opportunity to present pertinent material, and there being no genuine issue as to any material fact, the court treated the

motion as one for summary judgment in accordance with K. S. A. 1973 Supp. 60-212 (c). The trial court granted a permanent injunction and found:

"1. That for plaintiff to release data relating to criminal records of employees would violate the rights of such employees to privacy and would violate their confidential rights.

"2. That no immunity can attach to plaintiff for compliance with the subpoena—K. S. A. 1972 Supp. 44-1004 (5) specifically denies it immunity.

"3. That there is no compelling public necessity for such disclosures of such third persons' rights.

"4. That the subpoena duces tecum issued by the defendants is under all of the circumstances, improper.

"5. That unless permanent injunction is issued plaintiff will suffer irreparable damage, and will have no meaningful relief."

The scope of the Kansas Act Against Discrimination may be briefly summarized. The first act was originally passed in 1953 and it has been amended and expanded on a number of occasions since that time. K. S. A. 44-1001 declares in substance that it is the policy of the State of Kansas to eliminate and prevent discrimination in all employment relations, in places of public accommodations, and in housing. It is not only race discrimination which the act seeks to avoid; it also seeks to eliminate discrimination based upon religion, sex, physical handicap (1974), national origin and ancestry. K. S. A. 44-1004 sets forth the functions, powers and duties of the Commission. It is given broad powers to adopt suitable rules and regulations to carry out the provisions of the statutes. Under 44-1004 (5) it has the power to subpoena witnesses, compel their appearance, *require the production for examination of records, documents and other evidence or possible sources of evidence. The commission may issue subpoenas to compel access to or the production of such materials,* or the appearance of such persons, and may issue interrogatories to a respondent to the same extent and *subject to the same limitations as would apply if the subpoenas or interrogatories were issued or served in aid of a civil action in the district court.* The Commission may administer oaths and take depositions subject to the same limitations as would apply if the depositions were taken in the aid of a civil action in court. In case of refusal of any person to comply with any subpoena, the district court of any county may, upon application of the Commission, order compliance and failure to obey the order may be punished by the court as contempt. It may negotiate conciliation agreements, conduct hearings, and may make final orders, after a public hearing, granting relief to correct

patterns of discrimination and to prevent their reoccurrence. K. S. A. 44-1004 (9), (10), (11), and (12) authorizes the Commission, in cooperation with the State Department of Education, to carry out an educational program, to study the problems of discrimination and to encourage community effort to eliminate discrimination and foster good will among all elements of the population of the state. Under K. S. A. 44-1005 the Commission is granted broad powers of investigation where a verified complaint is filed, and it is given the same broad powers of investigation *even though a formal complaint is not filed.* K. S. A. 44-1005 further provides that if after such investigation it appears that probable cause exists for crediting the allegations of the complaint, the Commission may endeavor to eliminate the unlawful discriminatory practice by conference and conciliation.

In respect to the various powers conferred and the duties imposed upon the Commission by the legislature, 44-1005 specifically proscribes: *"The members of the commission and its staff shall not disclose what has transpired in the course of such endeavors."* (Emphasis added.)

If the Commission's efforts to eliminate an unlawful discriminatory practice by conference and conciliation fails, 44-1005 authorizes further proceedings upon a complaint wherein notice and hearing is contemplated. At this juncture the investigative function of the Commission ends and its adjudicatory function begins. (See, *Atchison T. & S. F. Rly. Co. v. Commission on Civil Rights,* 215 Kan. 911, 529 P. 2d 666.)

Limitation on the administrative power of investigation by the Kansas Commission on Civil Rights was under consideration in *Yellow Freight System, Inc., v. Kansas Commission on Civil Rights,* 214 Kan. 120, 519 P. 2d 1092, where the court had before it a subpoena, issued by the Commission in the course of investigating complaints charging discriminatory "layoff" practices, which ordered the employer to produce employment histories of all employees in the same class as the complainants. In answer to the employer's contention that the Commission was under a burden to prove the relevancy of the subpoenaed information to the specific acts of discrimination charged in the complaint, the opinion stated:

"The weight of authority of administrative law refuses to apply the stringent relevancy requirements of subpoenas in aid of civil or criminal litigation to agency subpoenas. The test of relevancy we approve is set forth in *Brovelli,* [56 Cal. 2d 524, 15 Cal. Rptr. 630, 364 P. 2d 462], where it is held:

" '. . . [I]t requires only that the inquiry be one which the agency demanding production is authorized to make, that the demand be not too indefinite, and that the information sought be reasonably relevant. (*United States v. Morton Salt Co., supra*, 338 U. S. 632, 651-654; *Oklahoma Press Pub. Co. v. Walling*, 327 U. S. 186, 202 *et seq.* [66 S. Ct. 494, 90 L. Ed. 614 166 A. L. R. 531].)' (p. 529.)" (p. 125.)

It was further held in *Yellow Freight*, that where there is a possibility of relevancy in the documents subpoenaed and there is no showing that the subpoena is unreasonable or oppressive the statutes granting the power to subpoena should be liberally construed to permit inquiry.

Recently, the Tenth Circuit Court of Appeals concluded in *Equal Employment Opportunity Commission v. University of New Mexico*, 504 F. 2d 1296 (10th Cir. 1974), that administrative subpoenas which were previously condemned as "fishing expeditions" are now permitted, *and that administrative subpoenas may be enforced for investigative purposes unless they are plainly incompetent or irrelevant to any lawful purpose.*

The appellants argue under the broad public policy mandate of the legislature, to eliminate and prevent discrimination in all employment relations, it was incumbent upon them in the course of investigating Lopez' complaint to seek answers to the following questions:

"1. Did appellee consider the arrest records of employees in contravention of the well settled rule of *Gregory v. Litton Systems, Inc.*, 316 F. Supp. 401, mod 472 F. 2d 631 (D. C. Cal 1970, which holds that arrests are irrelevant to the issue of employment, and that their consideration, in light of the generally recognized fact that members of minority groups are more frequently arrested than caucasians, would have a disparate and unlawful discriminatory effect upon members of minority groups?

"2. Did appellee, in contravention of the rule announced by the Supreme Court in *Griggs vs Duke Power Company*, 401 U. S. 424, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971), engage in an employment practice which operated to exclude minorities by consideration of factors not related to job performance; i. e., the consideration of a conviction when the nature of the conviction did not relate to the nature of the employment?

"3. Did appellee disqualify Arnold S. Lopez because of convictions yet knowingly hire others with the same or similar convictions?

"4. Did appellee's agents or employees who compiled the police records upon which employment decisions were made make 'errors' detrimental to members of minority groups while stating correctly the records of caucasians, thereby procuring management decisions discriminatory to members of minority groups?

The appellants argue the subpoenaed material is relevant to the determination of the second, third and fourth possibilities quoted above. The appellants do not dispute the Santa Fe's claim that the arrests (as opposed to convictions) of Lopez were not considered in its decisions not to hire him.

The Santa Fe takes the position the disclosure of the subpoenaed material does not reach any of the issues in Lopez' complaint charging the Santa Fe with discrimination based upon his race. Santa Fe urges that conviction records may only be considered by an employer in determining whether or not to hire an individual when the convictions are job related, and that Lopez' long record of drinking, fighting and traffic offenses was an appropriate consideration for the position of "Trackman". Santa Fe argues from affidavits in the record that "Trackmen" operate in gangs that vary from five to eleven people, live together in "bunk cars" or hotels for substantial periods of time and are occasionally authorized to drive their own cars to the work site. Thus, Santa Fe contends the only questions raised by Lopez' complaint is the extent to which his conviction record may lawfully be said to be job related, and that this question is not a comparative one; consequently, the conviction records of other employees are irrelevant.

The thrust of the appellants' argument may be summarized as follows: The controlling issue is not whether Santa Fe's alleged reasons for the dismissal of Lopez have merit, *per se,* but whether those reasons are pretextual and whether they reflect bias, conscious or subconscious, based on national origin. On this point we conclude it is relevant to the complaint that the Commission be permitted to investigate the subject personnel files in order to determine how "Trackmen" of national origins other than Lopez were treated in comparable situations.

Persuasive authorities supporting our conclusion are *McDonnell Douglas Corp. v. Green,* 411 U. S. 792, 36 L. Ed. 668, 93 S. Ct. 1817, and *Equal Employment Opportunity Commission v. University of New Mexico,* supra.

In *McDonnell Douglas Corp. v. Green,* supra, the United States Supreme Court dealt with a case involving a complaint under Title VII of the Civil Rights Act of 1964 filed by a black civil rights activist when his re-employment application was rejected because he had previously engaged in disruptive and illegal activity against McDonnell Douglas Corporation (McDonnell). A part of his pro-

test was that his discharge as an employee of the firm was based upon McDonnell's racially motivated general hiring practices. The court held that even though McDonnell's assigned reason for rejecting the complainant's re-employment application was sufficient to discharge its burden of proof at that stage to meet the complainant's *prima facie* case of racial discrimination, *still the inquiry must not end there.*" The court said:

". . . While Title VII does not, without more, compel rehiring of respondent, neither does it permit petitioner [McDonnell] to use respondent's [complainant] conduct as a pretext for the sort of discrimination prohibited by § 703 (*a*) (1). On remand, respondent must . . . be afforded a fair opportunity to show that petitioner's stated reason for [his] . . . rejection was in fact pretext. Especially relevant to such a showing would be evidence that white employees involved in acts against [McDonnell] of comparable seriousness . . . were nevertheless retained or rehired. [McDonnell] may justifiably refuse to rehire one who was engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike to members of all races.

". . . In short, on the retrial respondent [complainant] must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision." (pp. 804, 805.)

In *Equal Employment Opportunity Commission v. University of New Mexico,* supra, a case similar to the one at bar, the E. E. O. C. was investigating a complaint filed by an associate professor, who had been dismissed from the University's faculty, charging that he had been "discriminated against because of my national origin, Yugoslav." The University's reason for terminating the complainant alleged "poor performance and antagonistic attitude" which was "unacceptable and detrimental" to his department. In the course of its investigation, the E. E. O. C. issued a subpoena *duces tecum* for copies of personnel files of faculty members terminated from the complainant's department during a specified time interval, and copies of personnel files of all faculty members of the complainant's department as of a specified date. The E. E. O. C. instituted an action to compel the University to comply with the subpoena. The E. E. O. C. contended the information sought by its subpoena was necessary comparative data essential to ascertaining whether any transgressions attributed to the complainant had been committed by other employees who have been treated in the same manner as complainant. The University argued, in effect, that evidence of the complainant's poor job performance was so compelling that it constituted *the exclusive reason* for his termination and, therefore,

there was no need to investigate or inquire further. The Tenth Circuit held that the "broad sweep" of the Civil Rights Act dictated that such an inquiry could be pursued; the subpoena was relevant to the charge; the subpoena sufficiently described the information sought and was not overbroad and unreasonable in scope; it did not violate the Fourth Amendment prohibition against unreasonable searches, and was not arbitrary, capricious and unreasonable; and that the subpoena was enforceable without modification.

In the case at bar the trial court found the subpoena *duces tecum* issued by the Commission was under all of the circumstances improper; that for Santa Fe to release data relating to criminal records of its employees would violate the rights of such employees.

Having established the relevancy of the subpoenaed information, our inquiry will now be focused upon whether there exists a constitutionally protected right to privacy extending to the arrest and/or conviction records as reflected in the personnel files of the Santa Fe's employees.

It must be conceded, as Santa Fe argues, that the doctrine of *respondeat superior* creates a duty to the public on the part of the employer, a public carrier in this case, to know the background and history of a prospective employee before placing such employee in a position to act on behalf of Santa Fe. But this, Santa Fe contends, does not mean that every applicant for employment has surrendered his reasonable and legitimate expectations of privacy.

The record in this case discloses a high regard by the Santa Fe for the privacy and dignity of its employees. An adverse report as to a "criminal record" is not handled in a manner which is open to the eyes of any clerk processing papers. Such a report is sent to the division superintendent under a "personal-confidential" cover. If this report, as in the instant case, results in a decision not to hire, both the notice to the applicant and the company records prepared for payroll purposes disclose only "discharged account application disapproved." It is only when, as here, the applicant himself places the matter in issue that adverse data is ever disclosed by Santa Fe.

Here, however, the actual persons whose rights to privacy would be violated by compliance with the subpoena have raised no complaint. They have not placed their personal histories in issue. We are advised in Santa Fe's brief that in the course of the hearing on December 7, 1973, Santa Fe tendered to the court for examination *in camera* a sealed envelope containing the conviction records sought by the Commission. The court was advised the envelope

contained eleven such records, that six of the applications had been disapproved, and that of the balance, two had since resigned. It is these records, plus the records of employees who have only "arrest records", that the Commission seeks by its subpoena.

Santa Fe's employees in their application for employment authorized Santa Fe to obtain data regarding the applicants "personal record and reputation"; the applicant was required to consent to finger printing, and to disclose any history of crimes. Santa Fe argues that by so doing the employees no more surrendered their right to privacy as to any arrest or conviction records, than they surrendered their right to privacy as to their medical records by authorizing Santa Fe to conduct physical examinations or re-examinations.

Here the Commission does not challenge Santa Fe's right to raise constitutional issues of parties not before the court. The employees whose constitutional rights Santa Fe seeks to protect in this case are employees of Santa Fe who have made no complaint to the Commission, nor have they raised an issue as to the disclosure of adverse data in their personnel file.

In this connection see *Shelley v. Kraemer,* 334 U. S. 1, 92 L. Ed. 1161, 68 S. Ct. 836; *Barrows v. Jackson,* 346 U. S. 249, 97 L. Ed. 1586, 73 S. Ct. 1031; *Griswold v. Connecticut,* 381 U. S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678; and *Eisenstadt v. Baird,* 405 U. S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029, which seem to authorize Santa Fe to raise the constitutional right of third parties in a civil rights case.

Santa Fe contends the right of privacy which it seeks to protect on behalf of its employees is a constitutional right.

Constitutional rights, in and of themselves, do not create privileges. The constitution protects against improper invasion of such rights. This is illustrated by the issuance of a search warrant *ex parte* upon a showing of probable cause by the applicant, who believes that evidence may be found within the described premises. It is also illustrated in cases involving the warrantless search of a person, where a person may be "frisked" incident to an investigative stop based on less than probable cause to arrest, *Terry v. Ohio,* 392 U. S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; and also in cases where a full search of a person under lawful custodial arrest is a reasonable search under the Fourth Amendment, *United States v. Robinson,* 414 U. S. 218, 38 L. Ed. 2d 427, 94 S. Ct. 467. The basic requirement of the constitution and the courts is that an intrusion of a constitutional right is permissible if reasonable.

Here the Commission argues that there is no constitutionally guaranteed right to privacy extending to arrest and conviction records maintained in Santa Fe's personnel files which would prevent the subpoena of such records. It is argued the constitution only protects people from unreasonable intrusions into their privacy just as they are protected only from unreasonable searches and seizures, and that the intrusion into the employee's privacy in this case is reasonable.

Two decisions of the United States Supreme Court, *Griswold v. Connecticut,* supra, and *Katz v. United States,* 389 U. S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507, are frequently asserted as supportive of a constitutionally guaranteed right to privacy.

In *Griswold* it was held a Connecticut statute forbidding the use of contraceptives violated the right of marital privacy which is within the penumbra of specific guarantees of the Bill of Rights. There was sharp disagreement within the court as to which sections of the Bill of Rights were applicable. The majority opinion stated that the case concerned "a relationship lying within the zone of privacy created by several fundamental constitutional guarantees" and the Connecticut statute as applied invaded that protected area.

In *Katz,* supra, the court found the FBI's eavesdropping of the petitioner's telephone conversation, by attaching an electronic listening and recording device to the outside of the telephone booth from which the calls were made without obtaining a search warrant, constituted an unlawful search in violation of the Fourth Amendment. The court stated that the Fourth Amendment protects people, not places, and what a person seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. The court also stated that the Fourth Amendment cannot be translated into a general constitutional "right to privacy", though that amendment protects individual privacy against certain kinds of governmental intrusion. The court noted that other constitutional provisions protect personal privacy from other forms of governmental invasion, but

". . . [T]he protection of a person's *general* right to privacy—his right to be let alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual States." (pp. 350, 351.)

Justice White's concurring opinion in *Griswold,* supra, contains the following with respect to determining what invasions of privacy are constitutionally impermissible:

"An examination of the justification offered, however, cannot be avoided by saying that the Connecticut antiuse statute invades a protected area of privacy and association or that it demeans the marriage relationship. The nature of the right invaded is pertinent, to be sure, for statutes regulating sensitive areas of liberty do, under the cases of this Court, require 'strict scrutiny,' *Skinner v. Oklahoma,* 316 U. S. 535, 541, and 'must be viewed in the light of less drastic means for achieving the same basic purpose.' *Shelton v. Tucker,* 364 U. S. 479, 488. 'Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling.' *Bates v. Little Rock,* 361 U. S. 516, 524. See also *McLaughlin v. Florida,* 379 U. S. 184. But such statutes, if reasonably necessary for the effectuation of a legitimate and substantial state interest, and not arbitrary or capricious in application, are not invalid under the Due Process Clause. *Zemel v. Rusk,* 381 U. S. 1." (pp. 503, 504.)

The test as stated in Justice Goldberg's concurring opinion (joined by Chief Justice Warren and Justice Brennan) in the *Griswold* case, supra, follows:

"In a long series of cases this Court has held that where fundamental personal liberties are involved, they may not be abridged by the States simply on a showing that a regulatory statute has some rational relationship to the effectuation of a proper state purpose. 'Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling,' *Bates v. Little Rock,* 361 U. S. 516, 524. The law must be shown 'necessary, and not merely rationally related, to the accomplishment of a permissible state policy.' *McLaughlin v. Florida,* 379 U. S. 184, 196. See *Schneider v. Irvington,* 308 U. S. 147, 161." (p. 497.)

When the foregoing reasoning is applied to the instant case, we have no hesitancy in holding that enforcement of the Commission's subpoena requiring disclosure of the arrest and conviction records of the specified "Trackmen" for the purposes of its lawful investigation is not constitutionally impermissible as violative of the employees' right of privacy. The public policy of this State as declared in the Kansas Act Against Discrimination compels that the interests of the individuals affected by the disclosure be subordinated in order "to eliminate and prevent discrimination in all employment relations" (K. S. A. 44-1001).

However, the Santa Fe is rightfully concerned over any misuse of its employees' arrest and conviction records by the Commission. Public disclosure of such information could detrimentally affect the employees of Santa Fe. The sole justification for compelling the disclosure of such information by Santa Fe is to permit the Commission to investigate possible unlawful employment practices pursuant to K. S. A. 44-1001 *et seq.;* therefore, the Commission *must* honor the confidentiality of the arrest and conviction records it

seeks from Santa Fe and any use or dissemination of the disclosed information beyond the legitimate scope of its investigation is prohibited.

The duty of the Commission to maintain the confidentiality of the arrest and conviction records of Santa Fe's employees, which the Commission demands by the issuance of the subpoena herein, is imposed by the legislature in the Kansas Act Against Discrimination. K. S. A. 1972 Supp. 44-1005 (L. 1972, ch. 194, § 5) covers the subjects of *verified complaints by or for aggrieved persons, investigations,* hearing commissioners, conferences and conciliation and *subpoenas,* among others. In this section of the statute the legislature specifically proscribes: *"The members of the commission and its staff shall not disclose what has transpired in the course of such endeavors."* (Emphasis added.) The foregoing is an admonition by the legislature that the Commission, any member or members of the Commission, and any member or members of the Commission's staff are required to treat any and all information gathered in the course of an investigation by the Commission as confidential, even where such information is gathered pursuant to its power of subpoena, as here.

A similar situation confronted the United States Court of Appeals, Tenth Circuit, in *Equal Employment Opportunity Commission v. University of New Mexico,* supra. There the University contended the subpoenaed information was not sufficiently identified to protect University personnel from disclosure of confidential information, and that the subpoena must be modified, if enforceable, so as to describe the information sought in the various personnel files with particularity. It was stipulated at the trial that the subpoenaed personnel files and records were "both confidential and extremely sensitive." The court held the subpoena *duces tecum* "sufficiently describes the information sought and that although the information sought is confidential it must be, as stipulated, treated as such in the course of the investigation." As to the confidential nature of the files subpoenaed, the court said:

".  .  . It is specifically proscribed that any officer or employee of the Commission who makes public in any manner such information obtained in the course of investigation shall be guilty of a misdemeanor and, upon conviction, subject to a fine of not more than $1,000.00 or imprisoned not more than one year. 42 U. S. C. § 2000e-8 (e). *See* United States v. Powell, *supra.* Just as the Court in Powell, *supra,* did not require a showing of probable cause in order to sustain an IRS administrative summons of taxpayer accounts in a tax fraud investigation, so, too, in dictum, the Court observed that the 'probable

cause' requirement has been rejected in like circumstances involving other government agencies. 379 U. S. at 57. The Court there cited Oklahoma Press Publishing Co. v. Walling, Wage and Hour Administrator, 327 U. S. 186 (1946), and United States v. Morton Salt Co., *supra*, for the rule that the enforcement of administrative subpoenas rests upon showings that the investigation; (*a*) will be conducted pursuant to a legitimate purpose; (*b*) that the inquiry is relevant to the purpose; (*c*) that the information sought is not already in the possession of the administrative body; and (*d*) that the administrative steps required by Code have been followed.

"We thus conclude that under the statutes here applicable that subpoena duces tecum is enforceable even though no 'probable cause' has been shown that the University has violated the Act. . . ." (p. 1303.)

The Santa Fe contends the furnishing of arrest and conviction records by its officers, employees or servants pursuant to the subpoena issued by the Commission would place Santa Fe in jeopardy of suit for damages by all members of the class, and as a result it will suffer irreparable damage.

It is clear under K. S. A. 1972 Supp. 44-1004 (5) that no immunity could attach to Santa Fe by complying with the subpoena in question. The statute provides that no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he testifies or produces evidence, unless the person so testifying commits perjury. This section of the statute then provides: "The immunity herein provided shall extend only to natural persons."

By reason of the foregoing, Santa Fe argues, that if it complied with the subpoena, a cause of action could be stated against it in tort, under the doctrine *respondeat superior*, for invasion of the privacy of this class of employees. (Citing, *Froelich v. Adair*, 213 Kan. 357, 516 P. 2d 993.) Santa Fe further argues the threat of an action under 42 U. S. C. § 1981 *et seq.*, is more ominous. Section 1983 of the Federal Civil Rights Act provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Santa Fe cites *Monroe v. Pape*, 365 U. S. 167, 5 L. Ed. 2d 492, 81 S. Ct. 473; *Adickes v. Kress & Co.*, 398 U. S. 144, 26 L. Ed. 2d 142, 90 S. Ct. 1598; and *Whirl v. Kern*, 407 F. 2d 781, 787 (5th Cir. 1969), for the proposition that there can no longer be any question but that the "under color of" provision applies as well to unconstitutional

actions taken without state authority as to unconstitutional action authorized by state authority.

It must be conceded that no grant of immunity by the state would be binding in a federal court in an action brought under Section 1983, *supra,* (*Kletschka v. Driver,* 411 F. 2d 436, 448 [2nd Cir 1969]).

A fundamental requirement for sustaining a suit for damages under 42 U. S. C. § 1983 is that the citizen of the United States or other person within the jurisdiction thereof be deprived of ". . . any rights, privileges, or immunities secured by the Constitution and laws. . . ." Since we have determined that Santa Fe's disclosure of the subpoenaed information would not violate the constitutional rights of its employees, there is no basis for the employees to maintain a Section 1983 action against Santa Fe in a federal court. The broad sweep of the Federal Civil Rights Act is for all practical purposes identical to the broad sweep of the Kansas Act Against Discrimination, having as one of its directed purposes the elimination of discrimination in all employment relations. Under these circumstances we find it unnecessary to pursue further Santa Fe's argument that it would not be protected by proceeding "under color of" state laws.

Santa Fe contends it would be susceptible to a common law suit for invasion of privacy if it discloses the subpoenaed information.

This jurisdiction has recognized invasion of the right of privacy as a tort upon which a cause of action may be based. (*Kunz v. Allen,* 102 Kan. 883, 172 Pac. 532; *Johnson v. Boeing Airplane Co.,* 175 Kan. 275, 262 P. 2d 808; *Munsell v. Ideal Food Stores,* 208 Kan. 909, 494 P. 2d 1063; and *Froelich v. Adair,* supra.) In *Froelich,* supra, this court quoted the following rule from American Law Institute, Restatement of the Law Second, Torts, Tentative Draft No. 13, § 652D:

"One who gives publicity to matters concerning the private life of another, of a kind highly offensive to a reasonable man, is subject to liability to the other for invasion of his privacy."

By its subpoena the Commission sought a compilation made by Santa Fe of arrest and conviction records of specified employees. Arrests are frequently made in public and are publicized in the news media. Furthermore, pleas of guilty and convictions must be made in open court. Court records, subject to exceptions not here applicable, are open for inspection by any citizen (K. S. A. 45-201). In order to maintain an action for the public disclosure of private facts,

the facts disclosed to the public must be private ones, and not public ones (Prosser, LAW OF TORTS [4th Ed.] p. 836).

The legislature recognized the necessity to protect certain privileged communications by enacting statutes found between K. S. A. 60-423 and 60-440, including the revisions found in K. S. A. 1973 Supp. 60-426, 427, 428 and 439. Such privileges include those of an accused to refuse to testify, the privilege against self-incrimination, the lawyer-client privilege, physician-patient privilege, the marital privilege, the penitential communication privilege, and those privileges relative to religious beliefs, political votes, trade secrets, secrets of state, official information, communications to a grand jury and identity of an informer. Even these privileges are subject to certain reasonable intrusions as enumerated by the statutes. Most important, none of these privileges could in any way be tortured to extend to communications between an applicant and a prospective employer, nor do any of these privileges in any way deal with arrest and conviction records.

Thus it seems reasonably clear that neither the courts of this state nor the legislature have ever recognized any constitutionally guaranteed or protected right to privacy which extends to arrest and conviction records. (See, *Menard v. Mitchell,* 430 F. 2d 486 [D. C. Cir. 1970], reh. 328 F. Supp. 718 [D. D. C. 1971].)

Under K. S. A. 1972 Supp. 44-1004 (5) the Commission is authorized to issue subpoenas to compel access to, or the production of, such materials to the same extent and subject to the same limitations as would apply if the subpoena were issued or served in aid of a civil action in the district court. It could not be successfully argued that arrest and conviction records required in aid of a civil action in the district court could not be subpoenaed.

By reason of the foregoing we concluded it would not be oppressive or unreasonable to enforce the Commission's subpoena.

The judgment of the lower court is reversed.

FROMME, J., dissenting. The records and information sought by the Commission are not reasonably relevant to the complaint being investigated. The subpoena of the Commission imposes an unreasonable burden upon the employer and is oppressive. (See rule stated in majority opinion Syl. ¶ 6.)

The complaint of Arnold D. Lopez being investigated by the Commission charges that Santa Fe discriminated against him and

terminated his employment because he is a Mexican-American. He was hired on a temporary basis, pending investigation of his employment application, as a "trackman". The work of a "trackman" requires the employee to work closely with five to seven fellow employees. They live together in "bunk cars" or hotels for substantial periods of time. They are occasionally required to drive their own cars to the work site.

When Santa Fe made an investigation of the job applicant it discovered that Arnold D. Lopez had a history of twenty convictions of assaults, drunkenness, battery, resisting arrest and driving without a valid driver's license. Said convictions were of such a nature as to adversely affect his job performance as a "trackman". His temporary employment was terminated.

The foregoing facts were disclosed to the Commission and are not in dispute. Nevertheless the Commission issued the present subpoena seeking:

"Complete and total personnel records, including, but not limited to the 'Arrest and Conviction Records', of all employees hired into the 'Trackman' classification during the calendar year, 1972, in the Eastern Division, Atchison, Topeka and Santa Fe Railroad, Emporia, Kansas."

K. S. A. 44-1006 (Weeks) provides:

". . . Nothing in this act shall be construed to mean that an employer shall be forced to hire unqualified or incompetent personnel, or discharge qualified or competent personnel."

The subpoena issued by the Commission does not relate to any records which could assist them in determining the existence of discrimination based upon national origin. It shifts the investigation to discrimination against those who have conviction records adversely affecting job performance which is not within the area of concern of the Commission and not protected by law.

The majority of this court justifies the relevancy of the expanded investigation by saying that discrimination because of national origin is the controlling issue. The subpoena power is, therefore, being properly used to obtain arrest and conviction records of all employees of Santa Fe to inquire into the good faith of Santa Fe. It is said that this is reasonably relevant and not unduly oppressive because the Commission has a right to determine from these arrest and conviction records whether Lopez was terminated because of his national origin. This court states that the twenty convictions for assaults, drunkenness, DWI, battery, resisting arrest and driving

without a valid driver's license may have been only a pretextual reason used to cover up bias based on national origin. I cannot accept this premise. It can have no valid basis. "Fishing expeditions" may now be permitted but there remains the requirement that a subpoena be reasonably relevant to the subject matter of the complaint being investigated and cannot be unreasonable and oppressive. Accordingly, I would affirm the district court.

FATZER, C. J. and FONTRON, J., join in the foregoing dissent.